UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>BLAKELY D. SULLIVAN,<br><br>　　　　　Defendant. | Case No. 15-cr-40048-JPG |

### MEMORANDUM AND ORDER

This matter comes before the Court on defendant Blakely D. Sullivan's motion to suppress evidence seized on February 5, 2014 (Doc. 87). The Government has responded to the motion (Doc. 88). The Court held a hearing on the motion on August 9, 2016, at which the Government called as witnesses Illinois State Police Sergeant Jonathan Edwards and retired Illinois State Police Master Sergeant David Bartoni, and at which Sullivan testified on his own behalf.

Sullivan challenges a warrantless search of a vehicle he was using[1] on the afternoon of February 5, 2014, which yielded items claimed to be a cannabis grinder, a zippered "drug kit" with drug pipes, butane lighters, three glass jars with suspected residue, twenty pseudoephedrine tablets, coffee filters, an empty Aleve box and one gram of cannabis. Sullivan claims that the search violated his Fourth Amendment rights because law enforcement officers had no probable cause for the search. The Government claims a number of exceptions to the warrant requirement apply to justify the search.

---

[1] Sullivan testified that he did not own the car, but for simplicity's sake, the Court will refer to it as his. In its written response, the Government challenges Sullivan's standing to challenge the search of a car he did not own, but it failed to press the argument at the hearing. In any case, if Sullivan was using the vehicle with the owner's permission, he likely had standing to challenge a search of the vehicle. *Johnson v. United States*, 604 F.3d 1016, 1020 (7th Cir. 2010) ("Courts have repeatedly recognized the right of a driver to assert a Fourth Amendment right to be free from unreasonable searches of a vehicle where the driver is operating that vehicle with the permission of the owner.").

Sullivan is charged in this case with one count of conspiracy to manufacture methamphetamine (Count 1), one count of conspiracy to possess pseudoephedrine knowing it would be used to manufacture methamphetamine (Count 2), two counts of possession of a listed chemical (pseudoephedrine) knowing it would be used to manufacture methamphetamine (Counts 3 and 4), and two counts of possession of items knowing they would be used to manufacture methamphetamine (Counts 5 and 6).   The evidence seized is expected to be used in an effort to convict Sullivan of Counts 1, 2, 4 and 6.

**I.    Facts**

The Court found the witnesses to be credible as to facts about which they had personal knowledge based on their demeanor while testifying, the foundations they had for testifying to certain facts and the consistency of each witness's material testimony with other evidence in the case.   The evidence at the hearing established the following facts.

Prior to February 5, 2014, Sergeant Edwards was aware that Sullivan might have been involved in methamphetamine-related activity.   He and Master Sergeant Bartoni knew of Sullivan's prior federal conviction for methamphetamine activities.   Additionally, Edwards' law enforcement colleagues had arrested Sullivan in 2009 for methamphetamine on a warrant for a violation of his conditions of supervised release and had found methamphetamine manufacturing items in his home following that arrest.

About 3:45 p.m. on the afternoon of February 5, 2014, Inspector Sneed of the Southern Illinois Enforcement Group ("SEIG") contacted Edwards and told him that SEIG had a confidential sources ("CS") who had been in contact with Sullivan regarding purchasing pseudoephedrine pills and who said he would be able to get involved with drug activities with

Sullivan.  The CS had reported that he was currently at Double D's bar in Benton, Illinois, and was to meet with Sullivan shortly.  Upon receiving the information and in an effort to corroborate the CS's information, Edwards and several other law enforcement officers went to Double D's to set up surveillance in anticipation of Sullivan's arrival.

Before the surveillance was completely set up, the CS called one of Edwards' colleagues to report he and Sullivan had left Double D's but would return soon.  He reported that he had seen in the vehicle Sullivan was driving a clear plastic bag like the kind in which a comforter or bedding would be sold at a department store (a "bedding bag").  According to the CS, the plastic bag contained glass jars, coffee filters and other items the CS thought were involved with methamphetamine manufacturing.  Edwards' colleague gave the CS instructions about where to go when he returned to Double D's.  Edwards and his colleagues shared among themselves the information from the CS, discussed Sullivan's prior drug history, and completed the surveillance set-up in anticipation of Sullivan's return to Double D's.  Around 4:30 p.m. Sullivan and the CS returned to Double D's in a green Toyota Solara.  The CS got out and went where law enforcement had instructed him to go, and Sullivan drove away.  Officers attempted to follow Sullivan but lost track of him.  The officers did not seek a warrant at this time because they did not know where Sullivan's car was.

Edwards and another law enforcement officer picked up the CS and went to a designated meeting area where they talked with the CS in more depth.  In that conversation, the CS told the officers that Sullivan had asked him to purchase pseudoephedrine pills for use in manufacturing methamphetamine and that the CS and Sullivan had discussed whether the CS would be able to buy the pills in light of his prior conviction for a methamphetamine offense.  The CS also reported

that Sullivan had also been interested in whether the CS could obtain anhydrous ammonia, a catalyst in the method Sullivan said he preferred to use when manufacturing methamphetamine. The CS reported to the officers that Sullivan had had a small amount of methamphetamine on his person at that time.   The information received from the CS was consistent with other information the officers had received indicating that Sullivan had numerous, identified people buying pseudoephedrine pills for him to use in manufacturing methamphetamine, which was, in turn, consistent with National Precursor Log Exchange records reflecting that those particular people made such purchases.

Under Edwards' and another officer's supervision and observation, the CS called Sullivan around 5:30 p.m. to tell him he had come to believe he would be able to buy pseudoephedrine pills for Sullivan after all, but that he needed a ride to the store and money for the purchase.   After his conversation with Sullivan, the CS told the officers that Sullivan agreed to meet him at the nearby Huck's convenience store and give him a ride to the store.   Edwards searched the CS for weapons, cash and contraband and found nothing.   Another officer then drove the CS to Huck's, where law enforcement officers had set up surveillance to follow Sullivan and the CS to Wal-Mart, where they thought Sullivan would have the CS buy pseudoephedrine pills.   Bartoni joined the surveillance team at this time.

Shortly before 6:00 p.m., Sullivan arrived at Huck's in the Solara, picked up the CS and headed toward Wal-Mart.   However, before getting to Wal-Mart, Sullivan pulled into the parking lot of a CVS Pharmacy and parked close to the main entrance of the building.   The CVS is on the northwest corner of a busy intersection between the Interstate 57 Benton exit and Benton and in a heavily commercial area.   The CS got out of the car and entered the CVS.   Edwards and another

officer followed the CS inside, secured and searched him, and found a $20 bill the CS said Sullivan had given him to purchase pseudoephedrine.  Edwards took the CS out of the CVS and joined other officers in the parking lot.

In the meantime back in the parking lot, Bartoni and another officer approached Sullivan and asked him to get out of his vehicle.  They advised him that he was not under arrest but that he was not free to leave and advised him of his *Miranda* rights.  Bartoni conducted a pat-down search for weapons and felt a long, cylinder-type object in Sullivan's jacket pocket.  Thinking it could have been a weapon, Bartoni removed the object and found it was a glass smoking pipe of the kind that is used to smoke methamphetamine.  Bartoni asked Sullivan if he had anything else illegal on him, and Sullivan answered that he probably did.  Officers continued to search Sullivan's person and located in Sullivan's pocket three small containers with methamphetamine residue.

From his position in the parking lot, Bartoni could see lots of items in the car, including on the back floorboard behind the center console of Sullivan's car a clear plastic bedding bag containing jars like the bag described by the CS.  Thinking the bag might contain an active, volatile, flammable methamphetamine lab and concerned for the safety of the public in and around the CVS, Bartoni had one of the agents of the Meth Response Team ("MRT"), which is comprised of officers trained to deal with methamphetamine-manufacturing hazards, remove the plastic bag from the car and make sure it there was no active methamphetamine cook going on inside the bag. Officers then asked Sullivan for consent to search the car, and he said they had already found what they would be looking for.

After it was determined there was no active methamphetamine lab in the plastic bag and

Sullivan refused to consent to a search, Edwards applied to the state court for a warrant to search the vehicle. The warrant was obtained around 8:00 p.m., and the MRT then searched the vehicle and seized other items listed on the Inventory of Articles Seized: a cannabis grinder, a zippered "drug kit" with drug pipes, butane lighters, three glass jars with suspected methamphetamine residue, twenty pseudoephedrine tablets, clear plastic container with coffee filters, an empty Aleve-D pseudoephedrine box and approximately one gram of cannabis. The three glass jars and the clear plastic container with coffee filters were located in the bedding bag; all the other items seized were located in the passenger compartment of the vehicle. Copies of the return of the warrant and the inventory of seized items were never provided to Sullivan.

Throughout the entire series of events, officers never observed Sullivan violating any traffic laws.

**II.    Analysis**

As a preliminary matter, the Court clarifies the scope of the suppression request. In the written motion, Sullivan asked to suppress a cannabis grinder, a zippered "drug kit" with drug pipes, butane lighters, three glass jars with suspected residue, twenty pseudoephedrine tablets, coffee filters, an empty Aleve box and one gram of cannabis on the grounds that the search of his vehicle violated his Fourth Amendment rights because law enforcement officers had no probable cause for the search. At the hearing on the motion, defense counsel clarified Sullivan was only seeking to suppress items taken from the vehicle, not from Sullivan's person. Thus, this motion does not concern the drug pipe and container containing methamphetamine that were taken from Sullivan's person in the CVS parking lot.

A.    <u>Legal Standard</u>

The Fourth Amendment to the Constitution provides that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. Where evidence is obtained in violation of this guarantee, the exclusionary rule generally requires the evidence to be suppressed at a criminal trial where the utility of the rule in deterring unconstitutional police behavior outweighs its costs. *See Brock v. United States*, 573 F.3d 497, 499-500 (7th Cir. 2009). Generally, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357 (1967) (footnote omitted); *accord Arizona v. Gant*, 556 U.S. 332, 338 (2009).

B.    <u>Warrantless Search</u>

The bedding bag and its contents – the three glass jars with suspected methamphetamine residue and the plastic container containing coffee filters – are the only items arguably seized without a warrant. However, the search that yielded that evidence fell within the plain view, exigent circumstances and automobile exceptions to the warrant requirement as well as the inevitable discovery doctrine.

1.    <u>Plain View</u>

Under the plain view doctrine, officers may conduct a warrantless seizure of evidence where three conditions are met: "First, the officer may not have violated the Fourth Amendment in

arriving at the place from which the evidence could be plainly viewed. Second, the item must have been in plain view, and third, its incriminating character must also be immediately apparent." *United States v. Contreras*, 820 F.3d 255, 262 (7th Cir. 2016) (citing *Horton v. California,* 496 U.S. 128, 136 (1990)).

Bartoni and his fellow law enforcement officers were not violating the Fourth Amendment by being in the CVS parking lot standing beside Sullivan's car. The CVS was a commercial establishment open to the general public at the time, so the officers had a right to be there just like any other member of the general public. The bedding bag and the glass jars inside the bag were in Bartoni's plain view when he looked inside Sullivan's car from his position in the parking lot. Finally, in light of their knowledge of Sullivan's past methamphetamine-making activities, his current interest in recruiting the CS for obtaining methamphetamine-making chemicals, and the CS's report that Sullivan had methamphetamine-manufacturing items in such a bedding bag, specifically including glass jars, it was immediately apparent that the bedding bag and the glass jars inside were materials to manufacture methamphetamine. Thus, the removal of the bag and the jars from the car without a warrant was permitted under the plain view exception to the warrant requirement.

        2.      <u>Exigent Circumstances</u>

The exigent circumstances exception to the warrant requirement excuses a warrantless search where there is (1) probable cause to believe a crime is being committed and (2) a reasonable belief that exigent circumstances exist. *United States v. Venters*, 539 F.3d 801, 806 (7th Cir. 2008); *United States v. Marshall*, 157 F.3d 477, 481 (7th Cir. 1998). Probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence

in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States,* 517 U.S. 690, 696 (1996). Exigent circumstances exist where there is a compelling need for official action and no time to secure a warrant such as, for example, to protect someone from imminent injury or where lives are threatened. *Venters*, 539 F.3d at 806; *United States v. Clarke*, 564 F.3d 949, 959 (8th Cir. 2009). The scope of a search justified by exigent circumstances can only extend so far as to avoid the danger posed by those circumstances. *See Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993).

Courts have held that the dangers posed by the volatile nature of a methamphetamine manufacturing lab constitute exigent circumstances which, along with probable cause, justify a limited warrantless search. *See United States v. Walsh*, 299 F.3d 729, 734 (8th Cir. 2002) (strong smell of ether and known methamphetamine-related equipment and residue in the vicinity justified "quick looks" into a shed to "verif[y] that no untended heat source was creating an imminent risk of fire or the explosion of volatile chemicals"); *see also Clarke*, 564 F.3d at 959 (search justified where methamphetamine production gave rise to "potential threat to the safety of the officers, anybody inside the home, and anyone in the surrounding area"); *United States v. Erb*, 596 F.2d 412, 420 (10th Cir. 1979) (approving limited search to protect agents from volatile, active methamphetamine lab and to secure premises until warrant could be obtained).

Law enforcement officers had probable cause to believe evidence of a crime would be found in Sullivan's car.[2] They knew of his history of methamphetamine manufacturing and had just found a drug smoking pipe and a container possibly containing methamphetamine on his person. They were also aware of evidence that he was currently obtaining pseudoephedrine to

---

[2] Sullivan suggests that it is relevant that he committed no traffic violation prior to the search. It is not. The search was not justified by a traffic violation but by probable cause to believe evidence of a drug crime was contained in his car.

manufacture methamphetamine from others who would purchase it for him.   They also knew from the CS's report that Sullivan was trying to get the CS to obtain pseudoephedrine and anhydrous ammonia, materials used in manufacturing methamphetamine, for him, and that the CS had reported Sullivan had methamphetamine-making materials in a bedding bag in his car.

Exigent circumstances also existed.   Officers knew active methamphetamine labs were volatile and flammable and that a substantial number of people, including the officers themselves, might be in danger from an active methamphetamine lab if one existed in Sullivan's car.   The car was parked close to the main entrance of the CVS and in the vicinity of other commercial establishments and a major traffic intersection.   A methamphetamine lab explosion would pose a public safety hazard to anyone nearby.

Sullivan suggests exigent circumstances did not exist because officers knew about the bedding bag containing materials to make methamphetamine when the CS first told them the items were in the car, more than two hours before officers confronted Sullivan in the CVS parking lot. The Court believes this did not lessen the exigency presented in the CVS parking lot in the middle of a busy commercial area, circumstances which did not exist earlier when officers first spoke with the CS.   The exigency grew into a public safety hazard when Sullivan parked his car in a busy area and officers verified the presence of the bedding bag with glass jars in the car.

Finally, the scope of the search was appropriately limited to determining whether there was an exigency.   The bedding bag in which the methamphetamine cook might have been taking place was removed from the car, and it was determined shortly thereafter that no active cook was going on.   Thereafter, officers sought a warrant.   Removal of the bedding bag from the car in order to assess whether it was a live lab went no further than necessary to avoid the danger suspected to be

posed by the bag and its contents.

For these reasons, the Court finds the removal of the bag and the jars from the car without a warrant was permitted under the exigent circumstances exception to the warrant requirement.

### 3. Automobile Exception

Under the automobile exception to the warrant requirement, police may conduct a warrantless search of an automobile if they have probable cause to believe the vehicle contains evidence of criminal activity. *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014). The search may extend to "any area of the vehicle in which the evidence might be found." *Arizona v. Gant*, 556 U. S. 332, 347 (2009).

As discussed above in connection with the exigent circumstances exception, the officers in this case had probable cause to believe materials to manufacture methamphetamine would be found in Sullivan's car, specifically in the bedding bag. Therefore, officers were justified in searching the car, including the bedding bag, under the automobile exception to the warrant requirement.

### 4. Inevitable Discovery Doctrine

Even if the bedding bag and its contents had not fallen under the plain view, exigent circumstances and automobile exceptions to the warrant requirement, they would not need to be suppressed in light of the inevitable discovery doctrine. The inevitable discovery doctrine will prevent exclusion of evidence obtained by violation of a defendant's constitutional rights but which the Government can prove by a preponderance of the evidence would have been discovered anyway by lawful means. *Nix v. Williams*, 467 U.S. 431, 442-44 (1984). This ensures the Government is put into the same, not a worse, position than it would have been in had law

enforcement not committed an error or misconduct. *Id.* at 443. "To satisfy this burden, the government must show (1) that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence; and (2) that it would have conducted a lawful search absent the challenged conduct. In other words, the government must show not only that it *could* have obtained a warrant, but also that it *would* have obtained a warrant." *United States v. Pelletier*, 700 F.3d 1109, 1116 (7th Cir. 2012) (internal citation and quotations omitted).

In this case, based on Sullivan's history of methamphetamine activities, the information officers received from the CS, the bedding bag in plain view from the parking lot, and the pipe and methamphetamine found on Sullivan's person – but not on their removal of the bedding bag and its contents from the car – officers had an independent, legal justification for believing they would find evidence of contraband in Sullivan's car. Indeed, they used this information to obtain a search warrant to search the vehicle. Thus, even if the removal of the bag and its contents from the vehicle without a warrant violated the Fourth Amendment, the Court would not suppress that evidence because it would have been inevitably discovered in the search pursuant to the warrant.

    C.    <u>Search Pursuant to Warrant</u>

The remaining items sought to be suppressed were seized pursuant to a warrant, the propriety of which Sullivan has not challenged under the Fourth Amendment. His only challenge is that the return of the warrant and the inventory of items seized violated Illinois state law requirements. State law violations, however, do not always amount to federal constitutional violations, and Sullivan has not shown why they do in this case. Accordingly, any failure to provide Sullivan with post-seizure documentation does not warrant suppression of the evidence

seized.

### III.   Conclusion

For the foregoing reasons, the Court finds that the warrantless search that resulted in removal of the bedding bag and its contents from Sullivan's vehicle was justified under the plain view, exigent circumstances and automobile exceptions to the warrant requirement and is otherwise not subject to suppression in light of the inevitable discovery doctrine.   Other items were properly seized pursuant to a search warrant.   Accordingly, the Court **DENIES** the motion to suppress (Doc. 87).

**IT IS SO ORDERED.**
**DATED:   August 22, 2016**

                                              s/ J. Phil Gilbert
                                              **J. PHIL GILBERT**
                                              **DISTRICT JUDGE**